IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

───────────────────────────────────────────

UNITED STATES OF AMERICA,

      v.                                       18-CR-00068-A

MICHAEL GIOKAS,

               Defendant.

───────────────────────────────────────────

## GOVERNMENT'S SENTENCING MEMORANDUM

THE UNITED STATES OF AMERICA, by and through its attorney, James P. Kennedy, Jr., United States Attorney for the Western District of New York, and Assistant United States Attorney, Paul E. Bonanno, files this Sentencing Memorandum in response to Defendant's Sentencing Memorandum (Doc. 43).

## PROCEDURAL HISTORY

On April 16, 2018, the defendant appeared before this Court, waived prosecution by Indictment, and pleaded guilty to a single-count Information which charged a violation of Title 18, United States Code, Section 1343 (wire fraud).  As set forth in the plea agreement, the government and the defendant calculated a Sentencing Guidelines offense level of either 24 or 22, depending on whether the two-level increase for the use of sophisticated means applied.  Thus, with a criminal history category of I, the resulting sentencing guideline range of imprisonment anticipated by the plea agreement was 51 to 63 months or 41 to 51 months, a fine range of $20,000 to $200,000 or $15,000 to $150,000, and a period of supervised release of 1 to 3 years.

## STATEMENT OF FACTS

The government concurs with and relies on the detailed statement of facts set forth in the revised Presentence Investigation Report (Doc. 42) (the "PSR").

## APPLICABLE LAW

Title 18, United States Code, Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).

In determining an appropriate sentence, the Court must first correctly calculate the applicable Guidelines range.  *See Gall v. United States*, 552 U.S. 38, 49 (2007).  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Id.*  While the Guidelines are advisory, an error in determining the applicable Guideline range could render a sentence unreasonable on appellate review.  *See United States v. Selioutsky*, 409 F.3d 114, 118 (2d Cir. 2005).

After providing the parties an opportunity to argue for a sentence they deem appropriate, the Court must "consider all the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50.

Finally, after determining the sentence, the Court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.  "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority." *Rita v. United States*, 551 U.S. 338, 356 (2007).

## DISCUSSION

Defendant's sentencing memorandum suggests that the defendant engaged in criminal conduct to "bail himself out from financial straits."  Deft.'s Memo. at 4.  In fact, defendant's criminal conduct was motivated by defendant's desire to live a lavish lifestyle.

At the time of his arrest in this case, defendant owned a house in Clarence, New York, valued at almost a million dollars.  Defendant owned a second house in Ellicottville, New York, valued at more than $500,000.  Defendant also owned several luxury motor vehicles. Indeed, the day he was arrested, defendant was driving a Porsche SUV he had recently purchased using money he had stolen from one of the victims.  As set forth in the PSR, between May 26, 2017, and July 10, 2017 – a time period of only six weeks – defendant spent $190,734.23, which included $11,153.15 on retail shopping and restaurants, $9,664.25 on travel, and $15,728.08 in bank withdrawals.  *See* PSR, Doc. 42, ¶ 26.  The $190,734.23 defendant spent in this short time period was money he had stolen from victim G.S.  *Id.* ¶¶ 23-26.  Defendant could have chosen to cut back on his expenses, sell his second house, or drive a more modest car.  Instead, he chose to steal.

Worse, in order to fund his lavish lifestyle, defendant stole from individuals who knew him personally, who trusted him, and who, as retirees, were especially vulnerable. Defendant understood that his victims depended on the money in their investment accounts, and he stole it anyway.  As a result, a number of victims will have to struggle to make ends meet during their retirement.  For example, victim B.Z., who suffers from an autoimmune disease, and who was directed to retire by his/her doctors, has had to return to substitute teaching to help pay medical bills.  *See* PSR, Doc. 42 ¶ 33.  Victim B.C., who has been diagnosed with cancer, intended to use the funds defendant stole to help pay medical bills and living expenses.  *Id.*  Victim G.S. is no longer able to afford mortgage payments.  *Id.*  Victim M.V. will no longer be able to provide for his/her spouse following M.V.'s death.  *Id.*  These circumstances illustrate just how vulnerable the victims were.

Finally, defendant took advantage of the fact that his victims were not sophisticated in financial matters, particularly with respect to his "Trinity Council" scheme.  As set forth in the PSR, in May 2017, the defendant persuaded victim G.S., an elderly retiree, to invest $200,000 into a company called "Trinity Council, LLC," which defendant described as a fund that invested in private companies.  Defendant told G.S. that the investment principal would be guaranteed and would earn 8 to 9 percent interest per year.  Defendant even provided G.S. a notarized, 2-page promissory note which set forth a repayment plan, granted a security interest to G.S. in the company's assets, and contained default and choice-of-law provisions. G.S. followed defendant's recommendation and made the $200,000 "investment," which defendant deposited into a bank account he had opened at M&T Bank in the name "Trinity Council."  Doc. 42 ¶¶ 14-15.

In August 2017, defendant recommended that G.S. invest another $250,000 in Trinity Council. G.S. again followed defendant's recommendation, believing that the defendant had his best interests in mind. During a recorded telephone call, in which G.S.'s son asked for more detail on Trinity Council, defendant used sophisticated financial terminology to persuade G.S.'s son that the investment was legitimate:

> I'm doing a very small program…with no more than about a million point five in, uh, the funding, and so my job is to secure the funding, secure the interest, secure the collateral in through Trinity Council. So we're, we're doing some very small little programs that are guaranteed, uh, interest and they're collateralized to us and then we would pass that off obviously to [G.S.] or whomever so the program is just funding and we have a couple of corporate funding clients right now that we use this funding for already….
>
> It's all secured, secured stuff so we have a guaranteed interest rate so [G.S.] can get [the] monthly income coming out of the accounts…. [N]o quarterly statements on it, and the reason for it is that the, by law in terms of how we work with what's called our privacy policy, some of the people are clients of ours through the investment world and according to the SEC we have a, a privacy issue in terms of disclosure.

Doc. 42 ¶¶ 19-21. This scheme was perpetrated more than once. Defendant repeated it with seven more of his clients, persuading them to transfer an additional $407,000 to Trinity Council on the same fraudulent basis. *Id.* ¶¶ 28-29. There was, of course, no such "Trinity Council" investment fund.

Finally, the government maintains that the defendant employed sophisticated means to perpetrate this Trinity Council scheme, and that the two-level enhancement set forth in Sentencing Guidelines section 2B1.1(b)(10)(C) should apply. The term "sophisticated means" is defined in the commentary to the Sentencing Guidelines as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 Commentary, Application Note 9(B).

The sophisticated means enhancement has been held to apply in situations where the defendant generated false documents. *See United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014) ("We have recognized that the creation and use of false documents, and other tactics to conceal offense conduct, are indicia of the sophistication of an offense."); *United States v. Valente*, 688 Fed. Appx. 76, 80 (2d Cir. 2017) (affirming application of sophisticated means enhancement where defendant fabricated "sophisticated false documents relating to the status of the funds he took from his victims"); *United States v. MacCallum*, 2018 WL 2999907 (W.D.N.Y. June 15, 2018) (applying sophisticated means enhancement where, among other things, defendant gave fake promissory notes to investors to ensure them their money was secure).

Here, defendant set up two business bank accounts, one at M&T Bank and one at Empower Federal Credit Union, in the name "Trinity Council, LLC" in order to convince his victims that Trinity Council was a legitimate investment opportunity; he drafted a fraudulent promissory note which he provided to G.S. to convince him that his money was "collateralized" and therefore safe; and he purposely used sophisticated financial terminology, as set forth above, to convince G.S.'s son that the investment was legitimate. Defendant's victims – who lacked a sophisticated understanding of financial matters – were persuaded to invest in "Trinity Council" because defendant exploited his financial sophistication to deceive them and reassure them that their money would be safe.[1]

---

[1] The government takes no position with respect to the 4-level upward adjustment applied in the PSR for substantial hardship to five or more victims because that adjustment was not contemplated by the plea agreement. Pursuant to *United States v. Lawlor*, 168 F.3d 633 (2d Cir. 1999), the government is bound to advocate the Guidelines calculation set forth in the plea agreement.

**CONCLUSION**

Based upon the nature and circumstances of the offense, and the need for the sentence imposed to reflect the seriousness of the offense and afford adequate deterrence, it is the government's position that a sentence within the Guidelines range of 51 to 63 months would be sufficient but not greater than necessary to achieve the purposes of 18 U.S.C. § 3553(a)(2).

DATED:      Buffalo, New York, May 8, 2019.

JAMES P. KENNEDY, JR.
United States Attorney

BY:     s/ PAUL E. BONANNO
        Assistant United States Attorney
        United States Attorney's Office
        Western District of New York
        138 Delaware Avenue
        Buffalo, New York 14202
        (716) 843-5873
        Paul.Bonanno@usdoj.gov